UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Walter Schinzing,

Plaintiff

vs.

MEMORANDUM OPINION
And ORDER
Civil No. 00-2686 MJD/SRN

Mid-State Stainless, Inc.,

Defendant.

---

William L. Lucas, Esq. for and on behalf of Plaintiff.

Richard A. Arrett and Edwin Voigt, Vidas, Arrett & Steinkraus for and on behalf of Defendant.

---

Plaintiff Walter Schinzing brought this suit against Defendant Mid-State Stainless, Inc. ("Mid-State") alleging breach of contract. In response to Plaintiff's Complaint, Mid-State filed an Answer and Counterclaim, seeking a declaration of invalidity and non-infringement of U.S. Patent No. 5,133,375 (the "'375 patent") and alleging claims of fraudulent inducement and common law deceit.

FACTUAL BACKGROUND

Plaintiff filed a patent application with the United States Patent and Trademark Office (the "USPTO) on August 29, 1988, Serial No. 07/237,091, with respect to an automatic wheelchair washer. Bartz Affidavit Ex. D. He was listed as the sole inventor. Id. On December 20, 1988 and again on January 29, 1989, the USPTO rejected



FILED 7-17-02
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Plaintiff's claims as obvious under 35 U.S.C §103. Id. The application received final rejection in July 1989. Id.

While this patent application was pending, Elm Springs Enterprises ("Elm Springs"), a corporation formed by Plaintiff and investors for the wheelchair washer, arranged for four students from the University of Northern Iowa to work on improving Plaintiff's wheelchair washer. Schinzing Dep. 18. These students, Casey Cooling, Michael Sewick, Richard Nottger and Todd Petry, were asked to improve the wheelchair washer as part of a class project during the 1988-1989 school year. As part of that project, the students prepared a report entitled, "Wheelchair Modification Proposal" which listed proposed modifications to Plaintiff's washer. Bartz Aff., Ex. H. The students worked on the proposal and modifications throughout the school year and made a final presentation in the spring of 1989 to other members of their class, their professor, representatives from Elm Springs and a Congressman. Plaintiff gave a copy of the students' proposal to his attorney. Plaintiff Dep. 28.

On October 10, 1989, Plaintiff filed a Continuation-In-Part Application ("CIP") of the 07/237,091 Application. The CIP Application included additional claim elements, such as the tilting of the wheelchair(s) in the washing apparatus, a mechanism for tirning and additional jet sprays. Bartz Aff., Ex. R. Plaintiff's patent attorney at that time, Thomas Tate, testified at his deposition that certain information from the student report was used in preparing the CIP Application. Tate Dep. 17-20; Defendant Ex. 4. The CIP Application was rejected as obvious under 35 U.S.C. § 103 in January 1990. After this rejection, Plaintiff substituted counsel to prosecute this patent application. Bartz Aff., Ex. R. Amended claims were then presented to the patent examiner in June 1990. On

August 1, 1990, the amended claims were also rejected as obvious in light of the prior art: specifically the Haverberg '650 patent. Id. With regard to the Haverberg reference, the patent examiner stated:

> Haverberg discloses an article washer having a chamber large enough to accommodate the article that differs from the claim only in the intended use, namely, washing wheelchairs. Nonetheless, no patentable distinction is deemed to exist. Re claim 8, Haverberg discloses the rotatable roller (10,11 ). Re claim 9, Haverberg discloses the brush (51). Re claim 10, Haverberg discloses the pair of spaced apart rollers. Re claim 11, to have the roller located between the spaced rollers is obvious matter of mechanical design.

Id. The CIP Application was finally abandoned on March 14, 1991.

Plaintiff filed a third patent application, Serial No. 07/612,757, on November 14, 1990, with respect to the wheelchair washer. Bartz Aff., Ex. S. This application did not reference the prior applications referenced above, nor did it reference the Haverberg '650 patent as pertinent prior art. It listed as inventors Plaintiff, and his partners at Elm Springs, Dallas Foster, Gale Brinkman and Michael Meissen. The third application was rejected by a second patent examiner in July 1991. Id. Thereafter, amended claims were also rejected, and a final rejection was issued. In response to the final rejection, Plaintiff again submitted amended claims. The claims were finally allowed on February 5, 1992 and Plaintiff was granted the '375 patent, which claims the following:

> Claim 1. A washer for cleaning a conventional wheelchair, said wheelchair having a large diameter support and propulsion wheel on each side of a seat and a pair of small diameter guide wheels forward of the sat and below the level of the seat, said washer comprising:
>
> > (a) an enclosed washing chamber suitable for holding a conventional wheelchair, said chamber defined by end walls, side walls, a floor and a ceiling and having a doorway in one wall through which a wheelchair can be placed in and removed from the chamber;

(b) a sump in said floor, said chamber floor being slanted to drain liquid to said sump;

(c) means for supporting a conventional wheelchair elevated above said floor in said washing chamber for exposing the underside of said wheelchair and the entire area of the wheelchair wheels to cleaning and rinsing liquid;

(d) elongated tubular liquid spray arms rotatably mounted on walls and the ceiling of said chamber, said spray arms having a series of nozzles spaced apart lengthwise on said spray arms, said nozzles enabled to apply liquid onto all parts of a conventional wheelchair supported by said wheelchair supporting means including the underside of the wheelchair, the entire seating surface area of the wheelchair seat and the wheelchair wheels;

(e) means for feeding cleaning and rinsing liquid to said spray arms for rotating said spray arms and for providing said liquid to said nozzles;

(f) said means for supporting a conventional wheelchair including a rack having frame means for holding the front small diameter guide wheels of a conventional wheelchair to prevent the wheelchair from moving while being washed and roller means, the large diameter support and propulsion wheels of a conventional wheelchair resting on said roller means; and

(g) means for rotating said roller means for rotating said large diameter wheelchair wheels while liquid is applied to said wheels.

Claim 2. The wheelchair washer as described in claim 1 further including means for moving said frame means into and out of said washing chamber.

In April 1993, Mid-State entered into a License Agreement with S/S New Products ("S/S"), a Minnesota partnership comprised of Plaintiff and Sue Spalding[1]. Complaint, Exhibit A. Pursuant to the License Agreement, Mid-State was granted a license to develop, manufacture and market Licensed Products, which was defined in the Agreement as "any wheelchair cleaning assembly, subassemblies, components, replacement parts of other products which embody the Licensed Patent and Technology." Exhibit A, Art. I. "Licensed Patent" referred to the '375 patent, and

[1]Elm Springs assigned its rights under the '375 patent to Plaintiff. Plaintiff Dep. 161.

"Technology" was defined as "any knowledge, information, know-how, and devices, whether patentable or not, in the possession of S/S and relating to the Washer." Exhibit A, Art. I. In exchange, S/S was to receive a royalty of $400 per washer sold or leased. Upon termination, the License Agreement provided:

> D. Upon termination of this Agreement for any reason, nothing herein shall be construed to release any party from any obligation which matured prior to the effective date of termination. MSI, its affiliates or its sublicensees may after the effective date of such termination sell all License Products in stock and complete construction of all Licensed Products in the process of manufacture at the time of termination and sell the same, provided that MSI shall pay to S/S royalties on such License Products as specified in this Agreement.
>
> E. Upon termination for any cause, other than the expiration of the letters patent granted under the Licensed Patent, MSI shall no longer have any right to the use of the Licensed Product or Technology.

Exhibit A, Article VI. In a separate agreement, Mid-State agreed not to build or disclose any information to third parties regarding the wheelchair washers or carts to transport such washers. Complaint, Ex. B.

The parties operated under the License Agreement until 1997, at which time the Plaintiff terminated the Agreement. It is Plaintiff's contention that Mid-State continues to sell or lease wheelchair washers that are covered under the License Agreement, without paying royalties. It is Plaintiff's position that the language of the License Agreement is clear, and that under the Agreement, Mid-State cannot sell or lease what is defined as Licensed Product or Technology under the Agreement. Therefore, Mid-State is liable to Plaintiff under breach of contract. Mid-State argues that the '375 patent is invalid, and that therefore the License Agreement and the Nondisclosure Agreement are void for lack of consideration. Mid-State further argues that Plaintiff fraudulently induced it to enter

into the License and Nondisclosure Agreements, and that Mid-State is entitled to recover previously paid royalties as a result.

Before the Court is Plaintiff's motion for partial summary judgment, in which Plaintiff asks that the Court enter an order dismissing Mid-State's counterclaims, and declaring Mid-State liable on his breach of contract claim. Plaintiff also seeks an accounting, from Mid-State, of all wheel chair washing machines it either sold or leased as of April 1993. Also before the Court is Mid-State's motion for summary judgment, in which Mid-State asks this Court to find that: (1) the '375 patent is invalid; (2) the Licensing Agreement between Plaintiff and Mid-State is void for lack of consideration; and (3) Mid-State is entitled to all previously paid royalties as well as attorney's fees and costs.

## ARGUMENT

Standard for Summary Judgment

Summary judgment as a matter of law is appropriate when no genuine issue of material fact exists in the record. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986). A fact is material if resolving disputes concerning that fact affects the outcome of the case. See Anderson, 477 U.S. at 248. A dispute is genuine if, based on the evidence, a reasonable jury could return a verdict for either party. See id. at 252. On a motion for summary judgment, the Court views all evidence and inferences in a light most favorable to the nonmoving party. See id., 477 U.S. at 250. The moving party carries the burden to demonstrate the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(b); Celotex, 477 U.S. at 323.

Analysis

Plaintiff argues he is entitled to partial summary judgment on his breach of contract claim because it is undisputed that Mid-State has continued to sell or lease wheelchair washers that are covered by the License Agreement. Mid-State counters that the '375 patent is invalid, and that the License Agreement is therefore void for lack of consideration.

In response, Plaintiff argues that the License Agreement specifically provides:

> Nothing in this Agreement shall be construed as a warranty or representation by S/S as to the validity or scope of any Licensed Patent or a warranty or representation that anything made, used, sold or otherwise disposed of is or will [be] free from infringement of patents of third parties.

It is thus Plaintiff's position that pursuant to this language, the parties intended for the License Agreement to be enforceable regardless of whether or not the patent was later declared invalid. Plaintiff additionally argues that federal law does not preempt state contract law so as to preclude enforcement of a contract, citing to Aronson v. Quick Point Pencil Co., 440 U.S. 257 (1979).

In Lear, Inc. v. Adkins, 395 U.S. 653 (1969), the Supreme Court held that a licensee may contest the validity of a patent, because to do so furthers federal policy behind patent laws.

> Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

Id. at 670-671. In a later case, the Supreme Court reiterated that state law governing contracts is only preempted when such law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Aronson, 440 U.S. at 262. The contracts at issue in Aronson were negotiated while a patent application was pending for a type of keyholder. The first contract was an exclusive license agreement, that provided for a 5% royalty payment. A contemporaneous document provided that if a patent did not issue within five years, the royalty payment would be reduced to 2.5% of sales. Based on these facts, the Court held that the contracts were enforceable, because such contracts did not frustrate any of the purposes of policies of federal patent law.

> Enforcement of these contractual obligations, freely undertaken in arm's-length negotiation and with no fixed reliance on a patent or a probable patent grant, will "encourage invention in areas where patent law does not reach, and will prompt the independent innovator to proceed with the discovery and exploitation of his invention. Competition is fostered and the public is not deprived of the use of valuable, if not quite patentable, invention."

Aronson, at 266 (quoting Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 485 (1974)).

In Span-Deck, Inc. v. Fab-Con, Inc., 677 F.2d 1237 (8th Cir. 1982), the plaintiff had argued that Lear did not apply to the contract at issue, because the contract covered trade secret rights as well as patent rights. Id. at 1246. The plaintiff thus argued that Aronson should control. The Eighth Circuit rejected this argument, finding that because the contract at issue involved patent rights, Lear was more analogous because by virtue of the patent, certain ideas were removed from the public domain and the patents were necessarily used to negotiate the hybrid royalty. Id. at 1247. The court further held that

because the contract at issue made no allocation of the percentage of royalties attributable to patent rights and know-how rights, the entire royalty was avoidable. Id.

In this case, the License Agreement granted Mid-State exclusive rights under the '375 patent, together with defined Technology. Because the '375 patent was issued prior the execution of the License Agreement, the Court finds Lear is also more analogous than Aronson. Further, the Court finds that the License Agreement provides no allocation of the royalty payments between the Patent License and Technology. Thus, if the '375 patent is declared invalid, the entire royalty payment may be avoidable.[2]

A. Patent Invalidity

Mid-State asserts that the '375 patent is invalid for a number of reasons: (1) the patent application did not disclose all of the inventors, and by failing to disclose the proper inventors, Plaintiff committed fraud on the PTO; (2) the wheelchair washer was in public use more than one year prior to Plaintiff's patent application; (3) the student wheelchair modification proposal was a printed publication under 35 U.S.C. § 102(a); (4) the patent is obvious in view of the prior art; and (5)Plaintiff engaged in inequitable conduct by failing to disclose material information to the PTO.

[2]If Mid-State can show that it was fraudulently induced to enter into the License Agreement, Mid-State could seek return of all royalty payments made. Transitron Electronic Corporation v. Hughes Aircraft Company, 649 F.2d 871 (1st Cir. 1981). Mid-State's claims of fraudulent inducement are addressed later in this Memorandum Opinion. If, however, the patent is declared invalid, but Mid-State cannot show that it was fraudulently induced to enter into the License Agreement, royalty payments would be void as of the date the patent's validity was challenged by Mid-State. See, Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co., 112 F.3d 1561, 1568 (Fed. Cir 1997)(enforcing a license agreement, prior to the date a patent is challenged on validity grounds, does not frustrate federal patent policy).

1. Inventorship

Mid-State argues that the '375 patent is invalid under 35 U.S.C. § 102(f) because the University of Northern Iowa students were not named as joint inventors. Section 102(f) provides that "[a] person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented." Where nonjoinder of an actual inventor is proved by clear and convincing evidence, then a patent is rendered invalid. Pannu v. Iolab Corp., 155 F.3d 1344, 1349 (Fed. Cir. 1998),

> Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subjection of ever claims of the patent.

35 U.S.C. § 116. One is thus entitled to be named as an inventor on a patent if he/she: 1) contributed in some significant manner to the conception or reduction to practice of the invention; 2) made a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention; and 3) did more than merely explain to the real inventors well-known concepts and/or the current state of the art. Pannu, 155 F.3d at 1351.

Plaintiff does not deny that the students made contributions to his invention, although the parties dispute the significance of such contributions. Plaintiff appears to argue, however, that regardless of the significance of the students' contributions, the students were specifically engaged to make improvements to his invention, and in exchange, the students received educational benefits from their participation. He argues that this situation is analogous to an employee who is hired to invent, or to address a particular problem. If a patent issues in such a situation, the patent belongs to the

employer. See, Marshall v. Colgate, 175 F.2d 215, 217 (3rd Cir. 1949). The issue of ownership, however, is distinct from the issue of identifying inventors. While an employer may own the invention of an employee, the employee is nonetheless named in the patent as the inventor. In this case, none of the students have come forward to claim any ownership in the '375 patent. Mid-State merely argues that as the students were the originators of some of the claim elements claimed in the '375 patent, federal law does not allow Plaintiff to take credit for the students' ideas. 35 U.S.C. § 116.

The Court has reviewed the submissions of the parties and finds that a genuine issues of material fact exist as to whether certain of the students provided significant contributions to the claimed invention, warranting a finding that they are co-inventors. For example, at his deposition, Charles Cooling testified that the timing and control circuitry was his contribution to the invention. Cooling Dep. 15. Michael Sewick testified at his deposition that his contribution to the invention was to heat and recirculate the water. Sewick Dep. 14. He further testified that the addition of a sump was his idea, and that the concept of using elongated tubular liquid spray arms was Richard Nottger's. Id. at 23. Another one of the students, Todd Petry, testified that it was his idea to use a motorized roller assembly to rotate the rear wheels. Petry Dep. 6. While Plaintiff testified that some of these ideas were his, he could not conclusively testify that the addition of the timing mechanism, comprised of a circuit timer chip, was the idea of Charles Coolings or that the idea of the rotary spray arm was that of Richard Nottger. Plaintiff Dep. 70-71, 110-111. The Court also finds it significant that Plaintiff was not aware of why Dallas Foster, Gale Brinkman and Michael Meissen were named as inventors on the '375 patent. Plaintiff Dep. 35-36. Finally, a jury could reasonably find

that the students' contributions were significant, given the fact that the student report was used, in part, for the CIP application. Defendant's Ex. 4.

2. Public Use

Mid-State also claims that the patent is invalid pursuant to §102(b) because the apparatus was in use more than one year before the date of the patent application, November 14, 1990. Specifically, Mid-State argues that the exhibition of the invention in the spring of 1989 in front of classmates, professors, representatives of Elm Spring and Congressman Nagle, without the use of confidentiality agreements, constituted public use.

The Federal Circuit has defined "public use" as "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." Lough v. Brunswick Corp., 86 F.3d 113, 1119 (Fed. Cir. 1996). Whether an invention has been in public use requires consideration of the totality of the circumstances in light of the policies underlying this doctrine. Id. The policies include:

> 1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; 2) favoring the prompt and widespread disclosure of inventions; 3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and 4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

Id. (citing Tone Bros. v. Sysco Corp., 28 F.3d 1192, 1198 (Fed. Cir. 1994) cert. denied 514 U.S. 1015 (1995)).

Factors the Court should consider in determining whether the wheelchair washer was in public use include: 1) the number of prototypes and duration of testing; 2) whether records or progress reports were made concerning the testing; 3) the existence of confidentiality agreements between the patentee and the party performing the testing; 4) whether the patentee received compensation; and 5) the extent of control the inventor maintained over the testing. Id.

The evidence shows that when Elm Springs Enterprises brought the original prototype to the students at the University of Northern Iowa, the invention was still in the developmental stage. Throughout the 1988-1989 school year, the evidence shows that a number of improvements were suggested for the invention, including the rotating spray arms, sump, slanted floor, the programmable logic controller, water temperature, and the rotating wheel mechanism. Finally, in the spring 1989, the students gave a demonstration of the wheelchair washer, which included the proposed modifications as discussed in the student report. Defendant's Ex. 8.

The evidence is disputed, however, as to whether confidentiality agreements were entered into between the University, the students or the professor. Plaintiff testified at his deposition that such confidentiality agreements were entered into, and that he had seen them. Plaintiff Dep. 17-18. The students and the professor, however, testified that no confidentiality agreements were entered into. See, Cooling Dep. 9; Sewick Dep. 10; Petry Dep. 9; Honary Dep. 15-16.

The Court also finds that the evidence is disputed as to the Plaintiff's level of control over the testing. Plaintiff contends that he made the suggestions to the students, who simply implemented such suggestions, and that either he or representatives from Elm

Springs met frequently with the students throughout the school year to determine the students' progress. Plaintiff Dep. 15-16. The students and the professor, on the other hand, testified that the Elm Springs Enterprises representatives only gave them some general guidelines as to how they wanted the wheelchair washer to work, but that the students and professor collectively came up with the manner and means in which to achieve such results. See, eg. Cooling Dep. 17; Sewick Dep. 32; Honary Dep. 11-12. There is also evidence that the students were free to consult with outside parties as to the suggested improvements to the invention. For example, the students met with a representative from Amana to discuss the spray arm, and water pressure. Honary Dep. 37. It may be that the actual invention was discussed with this representative. Accordingly, summary judgment on the issue of public use is not appropriate on the current record.

Mid-State also argues that the student report constitutes a printed publication, thereby rendering the '375 patent invalid under 35 U.S.C. §102(b) because it was produced more than one year before Plaintiff's patent application was filed. To determine whether a paper is a "printed publication" as contemplated within § 102(b), the Court must look to publication's dissemination and public accessibility. In re Cronyn, 890 F.2d 1158 (Fed. Cir 1989). In Cronyn, the Federal Circuit held that a student thesis, filed in a university library, was not a printed publication because the thesis had not been meaningfully catalogued or indexed. As a result, the publication was not reasonably accessible to the public. Id. at 1161.

In this case, the evidence shows that the student report was disseminated to the representatives of Elm Springs and the students' professor. There is no evidence that the

report was filed in any type of University or other library system. Thus, there is no evidence that the student report is reasonably accessible to the public.

Mid-State argues that Cronyn is distinguishable from this case, however, because Plaintiff commissioned the student report, and it was published to him. Under these circumstances, whether the report was reasonably accessible to the public is irrelevant. Plaintiff contends, however, that the ideas contained within the student report were actually his. If Plaintiff succeeds in proving this at trial, the report will not be deemed a printed publication. Accordingly, genuine issues preclude a finding of whether the student report is a printed publication that would render the '375 patent invalid.

3. Inequitable Conduct, Fraud on the PTO, Duty of Candor

Mid-State asserts that failure of Plaintiff to disclose to the PTO that the students were co-inventors, and failure to turn over the student report, constituted fraud on the PTO, inequitable conduct and a breach of his duty of candor as provided in 37 C.F.R. § 1.56.

Because genuine issues of fact exist as to the students' contribution to the '375 patent, summary judgment on these claims is not appropriate.

4. Obviousness

Mid-State argues that Claim 1 of the '375 patent is obvious to one skilled in the art in view of Clark (U.S. Patent No. 3,096,775), Zademach (U.S. Patent No. 2,744,532) and Haverberg (U.S. Patent No. 2,718,650) or Davis (U.S. Patent No. 2,716,767). Affidavit of Richard Bartz, ps. 14-16.

Title 35 U.S.C. § 103 provides that a patent will not issue "if the differences between the subject matter sought to be patented and the prior art are such that the

subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The ultimate determination of obviousness is a legal conclusion, resting on factual determinations under § 103. Lamb-Weston, Inc. v. McCain Foods, Ltd., 78 F.3d 540, 543 (Fed. Cir. 1996).

Clark discloses a washing apparatus for a hospital cart, which claims a cabinet, with at least one open end, and having top and side walls, a slanted floor, and spray nozzles. Defendant Ex. U. Zademach claims a washing machine for metal parts and a cabinet rack, with a housing and rotatable spray arms. Defendant Ex. M. Davis and Haverberg both disclose rollers for washing and rotating wheels. Defendant Exs. N and O. Bartz opines that a person skilled in the art, in view of the teachings of Clark, Zademach, Davis or Haverberg, could provide a washing apparatus which includes all of the elements of claim 1 of the '375 patent.

The Court disagrees. Claim 1 (c) discloses a means of elevating the wheelchair above the floor to allow every surface of the wheelchair to be cleaned. This element is not taught in the above cited prior art. In addition, claim 1 (f) discloses a rack having a frame to secure the wheels, in order to prevent the wheelchair from moving during cleaning. This element is also not taught in the above cited prior art. Accordingly, the Court finds that the '375 patent in not obvious in light of Clark, Zademach, Davis or Haverberg.

B. Fraudulent Inducement

Mid-State argues that Plaintiff used the presumption of validity and the associated patent monopoly for the '375 patent to compel Mid-State to enter into the License

Agreement. Mid-State argues that had Plaintiff disclosed his failure to provide the PTO material information, Mid-State would have conducted an investigation into the validity of the '375 patent prior to entering into the License Agreement.

Under Wisconsin law, a party alleging fraud must demonstrate, by clear and convincing evidence: (1) a false representation; (2) that the false representation was made with the intent to defraud and for the purpose of inducing another to act upon it; and (3) that the party relied on the false representation. W.H. Hobbs Supply Company v. Ernst, 270 Wis. 166, 169, 70 N.W.2d 615, 617 (1955).

The Court finds that genuine issues of material fact preclude summary judgment as to this claim as well.

IT IS HEREBY ORDERED that:

1. Plaintiff's Motion for Partial Summary Judgment is GRANTED as to Mid-State's Counterclaim that the '375 patent is invalid as obvious in view of Clark, Zademach, Haverberg or Davis, and DENIED as to the remaining claims and counterclaims.

2. Mid-State's Motion for Summary Judgment is DENIED.

3. Plaintiff's Motion to Strike is DENIED.

Date: 7-16-02

Michael J. Davis
United States District Court