**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Walter Schinzing,**

**Plaintiff,**

**v.**

**Mid-State Stainless, Inc.,**

**Defendant.**

**Civil No. 00-2686 SRN**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

William L. Lucas, Esq., on behalf of Plaintiff.

Richard A. Arrett, Esq. and Edwin E. Voigt, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

On April 28, 2003, the parties in the above-entitled matter consented to the exercise of jurisdiction by a United States Magistrate Judge and the Honorable Michael J. Davis, United States District Judge for the District of Minnesota, ordered the case referred to the undersigned. This matter was tried to the Court on May 19 and 20, 2003.

## I PROCEDURAL HISTORY

On October 30, 2000, Plaintiff Schinzing ("Schinzing") filed a Complaint in Hennepin County District Court alleging breach of a license agreement for United States Patent No. 5,133,375 (the '375 Patent). On December 11, 2000, Defendant Mid-State Stainless removed the case, denied the allegations of breach, and raised the following ten affirmative defenses: (1) joint ownership of the licensed patent; (2) the patent license was no longer in force; (3) invalidity of both the patent license and disclosure document for lack of consideration; (4) patent misuse; (5)

FILED DEC 03 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD DEC 03 2003
DEPUTY CLERK

no breach of the patent license; (6) invalidity of the license agreement for lack of consideration because the '375 patent is invalid; (7) no breach because the '375 Patent does not cover any Mid-State product; (8) invalidity and unenforceability of the license agreement because the '375 Patent is invalid because it does not name the correct inventors; (9) invalidity of the '375 Patent due to Schinzing's and/or his counsel's inequitable conduct before the United States Patent Office; and (10) Mid-State was fraudulently induced to enter the license agreement. Mid-State also counterclaimed for a declaratory judgment of patent invalidity of the '375 Patent and for fraudulent inducement and common law deceit.

On July 16, 2002, Judge Davis issued a Memorandum Opinion and Order addressing the parties' cross motions for summary judgment. Judge Davis granted Schinzing's motion for summary judgment as to Mid-State's Counterclaim that the '375 Patent is invalid as obvious. Judge Davis denied the rest of Schinzing's summary judgment motion and denied Mid-State's summary judgment motion.

**Exhibits And Testimony**

At trial, Schinzing introduced exhibits 1-8 and Mid-State introduced exhibits 1-31 and 35-62, by stipulation. Also, at trial, the deposition testimony of Walter Schinzing, Casey, Cooling, Todd Petry, Professor Lou Honary, Michael Sewick, Thomas Tate and Marvin Jacobson was admitted by stipulation. Walter Schinzing was the only witness in his case-in-chief. Marshall Ryan of Mid-State Stainless, Todd Petry, and Richard Bartz testified in Mid-State's case-in-chief. All of the deposition testimony and exhibits relied on by Judge Davis in his Memorandum Opinion and Order were also admitted into evidence at trial, including the Bartz Affidavit, which is the expert report of Defendant's patent expert.

## II FINDINGS OF FACT

### Initial Conception And Development

1. Schinzing conceived the idea of a machine for washing wheelchairs in 1987, while employed as Director of Plant Operations for a nursing home named the White Bear Care Center. (Transcript of Proceedings (Tr.) p. 14, line 20-p. 16, line 1.)

2. Schinzing received permission from White Bear Care Center to take home a wheel chair which he used while constructing a prototype wheelchair washing machine out of a thick cardboard box measuring approximately 40 inches in height, width, and breadth, and half-inch wide piping. (Tr. p. 16, lines 4-17.)

3. Schinzing constructed the prototype over a period of six to seven months. He hooked the pipes up to his garden hose and placed the device on two by fours to elevate it four inches off the ground. (Tr. p. 17, lines 2-14.)

4. Schinzing had a company named Stenberg Welding build the second prototype in the Spring of 1988. It was a stainless steel prototype which had fixed spray nozzles, no rotating spray arms, no motorized roller assembly, and no water recirculation back to the spray arms. (Tr. p. 18, line 6-p. 20, line 23 & p. 96 line 14–p. 97 line 8.)

5. Later in 1988, Schinzing met with a group in Greene, Iowa that had advertised for new products and showed them the second prototype. (Tr. p. 21, lines 8-15.)

6. Schinzing and the group formed a company named Elm Springs Enterprises (Elm Springs). The five shareholders of Elm Springs were Schinzing, Richard Vickers, Patrick Vickers, Gale Brinkman, and Michael Meissen. (Tr. p. 21, lines 19-21, p. 22, lines 3-4, p. 22, line 22-p.23, line 2, & p. 24, lines 13-22.)

7. In the fall of 1988, with Schinzing's permission, Elms Springs took his prototype to the PLUS Methodology and Conceptualization class, an undergraduate class, at the University of Northern Iowa, taught by Professor Honary. (Tr. p. 26, line 1-p. 29, line 21, p. 180, line 7; Honary Depo. at 3.)

8. Patrick Vickers explained to Schinzing that the prototype would provide a learning experience for the class. In addition, if the class went well and the university received recognition, Vickers believed Elm Springs could apply for and likely receive a grant. (Tr. p. 26, lines 10-24.)

9. The students in the class, Casey Cooling. Michael Sewick, Richard Nottger and Todd Petry, were asked to improve the wheelchair washer as part of a class project during the 1988-1989 school year. (Memorandum Opinion and Order page 2).

10. When the stainless steel prototype was dropped off at the University of Northern Iowa, it had fixed nozzles, rather than rotary spray arms, and did not have a motorized roller assembly or recirculation of water back to rotary spray arms. (Tr. p. 183, line 23-p. 184, line 8.)

11. The students in the class were not told what improvements the prototype required; Elm Springs told them only that they wanted recommendations. The students initially tested the prototype, found it did not work satisfactorily, and made a list of things that needed improvement. (Tr. p. 193, lines 10-19, p. 183, lines 2-9, p. 182, lines 2-10.)

12. Throughout the class, three Elm Springs representatives would periodically visit, and the students would give progress reports which included the problems with the machine, and the areas on which they were going to work. (Tr. p. 183, lines 10-14.)

13. Schinzing attended the initial meeting and three other meetings, and the only

student he met with individually was Petry. (Tr. p. 30, lines 8-24.)

14. One of the students proposed using a similar design that was used in a dishwasher for the spray arms. Petry proposed using two rollers, one that drove and one that simply spun to rotate the wheels. Petry also stated he had the idea to install a brush to clean the wheels, and was never told to do so by Schinzing. (Tr. p. 193, line 22- p. 194, line 10.)

15. Schinzing initially told Petry that the wheelchair wheels needed to be rotated when the chair was cleaned, but did not tell Petry how to do it. Schinzing testified that the idea to use a motorized roller assembly with two rollers spaced apart, driven by a quarter horsepower motor with a chain was his idea, but he did not tell that to Petry so as not to interfere with the learning process. (Tr. p. 117, line 6-p. 118, line 8.)

16. Schinzing informed Petry that the roller system Petry had designed would not work, because the rollers were made of rubber, and when covered with water and soap, would slide rather than rotate the wheels. Schinzing also told Petry that extending the motor out of the side of the machine would not work because the machine would then not fit through doors and the motor would be knocked off the side quickly. Schinzing stated that the brushes were already in place when Elm Springs first met with the class. (Tr. p. 31, lines 21-22, p. 32, line 14- p. 33, line 5.)

17. Sewick claims that element (b) of claim 1 of the '375 Patent, "a sump in said floor, said chamber floor being slanted to drain liquid to said sump" was his idea, and that Petry, or the class collaboratively, thought of the means by which the wheelchair was elevated above the floor. Sewick also believed Petry had the idea for element (g)'s "means for rotating said roller, means for rotating said large diameter wheelchair wheels while liquid is applied to said

wheels." Sewick's claimed contribution to the invention was to heat and recirculate the water. He further testified that the addition of a sump was his idea, and that the concept of using elongated tubular liquid spray arms was Richard Nottger's idea. (Sewick Depo. at 4-5, 14, & 23-25.)

18. The bottom of page four of the students' final report discusses the distribution of the wash and rinse water which, on the prototype, was performed by fixed jets positioned along the top, bottom, and each side of the cabinet. The report states, "By dispensing water through rotating arms of similar design to that currently used in a modern dishwasher, coverage could be dramatically increased." It then proceeds to state that by using four rotating arm assemblies by mounting two arm assemblies over the wheelchair and one on each side, total coverage could be attained. (Def. Ex. 10.)

19. Cooling recalled that Petry designed the motorized roller assembly. (Cooling Depo. at 3 & 14-15.)

20. Schinzing did not invent rotary spray arms for the machine, and does not know who did. (Tr. p. 116, lines 5-20.)

21. The students submitted a final report titled "Wheel-Chair Modifications Proposal" (students' final report), which included drawings, or figures, they had made of the machine they modified. (Tr. p. 185, lines 19-25, p. 189, line 25–p. 191, line 24; Def. Ex. 8.)

22. The students conducted a final presentation of the modified prototype, which incorporated their work as part of the class requirements. In this presentation, the students ran the modified prototype with a wheelchair inside. (Tr. p. 124, line 25- p. 125, line 14.)

23. Schinzing and other members of Elm Springs attended the final presentation, as

well as Congressman David Nagle, various professors, and students. (Tr. p. 125, line 2, p. 196, lines 13-24; p. 198, lines 2-4; Petry Depo. at 8; Sewick Depo. at 7-8 & 21-22; Cooling Depo. at 9; Honary Depo. at 28-29.)

24. Elm Springs received a copy of the final report and Schinzing received a copy from Elm Springs. (Tr. p. 107, line 8.)

25. Schinzing recalled that Elm Springs had confidentiality agreements with Professor Honary and the students, but he did not prepare them himself and could not produce copies. (Tr. p. 73, line 8-p. 77, line 9; Schinzing Depo. at 17.)

26. Honary, Sewick, Cooling, and Petry, did not recall ever entering confidentiality agreements. (Cooling Depo. at 9-10; Sewick Depo. at 10; Petry Depo. at 9; Honary Depo. at 15-16.)

27. After the class was completed, Elm Springs took the machine back. (Tr. p. 39, line 13, p. 88, lines 1-7.)

28. After Elm Springs took the machine back, they hired Dallas Foster to develop it from the prototype stage into a working and then a production model. Foster made significant changes to the machine. He first developed a clear plastic third prototype, which made it possible to see inside it while it worked, and then a stainless steel fourth prototype (Tr. p. 39, line 13-p. 40, line 10, p. 88, lines 10-17.)

29. While Foster was developing the machine, he would periodically show Schinzing what he had done, and they would discuss further changes. (Tr. p. 40, lines 4-8.)

**Patent History**

30. On August 29, 1988, before the prototype was brought to the University of Northern Iowa, Schinzing filed a patent application with the United States Patent and Trademark Office (USPTO), Serial No. 02/237/,091 for an automatic wheelchair washer, listing himself as sole inventor. On December 20, 1988, and again on January 29, 1989, the USPTO rejected Schinzing's claims as obvious under 35 U.S.C. §103. The application received final rejection in July, 1989. (Memorandum Opinion and Order at 1-2.)

31. On October 10, 1989, attorney Thomas Tate filed a Continuation-In-Part Application (CIP) of the 07/237,091 for Schinzing. (Memorandum Opinion and Order at 2; Def. Ex. 17.)

32. Schinzing affirmed that he was the original, first, and sole inventor. (Schinzing Depo. at 111-12; Def. Ex. 17.)

33. Tate communicated with Schinzing and the attorneys, the Vickers brothers, from Elms Springs . It was Tate's understanding that, as part of getting a marketable product, they were having the university students do some testing of various features. (Tate. Depo. at 6-7.)

34. In a January 20, 1989 telephone conversation between Tate and Richard Vickers of Elm Springs, Vickers told Tate that some of the changes in design by the students were the rotating arms instead of stationary jets, and that Vickers would send final designs when they were ready, and then determine if additional patent applications would be needed. (Tate Depo. at 9-10.)

35. Schinzing gave Tate a copy of the students' final report. (Tr. p. 107, lines 5-12; Tate Depo. at 18.)

36. Tate did not recall having a discussion with Schinzing about inventorship related to the new subject matter in the CIP application. (Tate Depo. at 11.)

37. It was Tate's understanding that the students were doing this project based on instructions that Schinzing gave to the students. No one from the university ever called Tate stating that they thought the students should be listed as co-inventors. Tate did not have any subsequent conversations with Schinzing about inventorship related to the students at the university. (Tate Depo. at 21.)

38. Claims 2 through 6 of the CIP application related to new subject matter added on and not included in the original claim. (Tate Depo. at 13.)

39. The rotary spray arms of claim 2, and the means for washing being a roller assembly with a brush of claim 4 in the CIP application were new subject matter. (Tate Depo. at 14.)

40. Tate produced a handwritten draft CIP application which included the same claims that were filed in the second CIP application. The first three paragraphs of the draft CIP application state: (1) "Include description of roller assembly," referring to the motorized assembly that was part of the new subject matter; (2) "As an alternative, rotary arm," referring to the rotary arms that were also part of the new subject matter; and (3) "add description of timing circuit," referring to drawings 5 through 8 of the student proposal which were also part of the new subject matter. (Tate Depo. at 15-16.)

41. Tate used Figures 10 through 13, which are on pages 34-37 of the students' final report as Figures 5 through 8 of the CIP application. (Tate Depo. at 10 & 19-21.)

42. On January 17, 1990, the CIP application was rejected as obvious under 35 U.S.C.

§ 103. (Memorandum Opinion and Order at 2; Def. Ex. 17.)

43. On April 17, 1990, Schinzing revoked Tate's power of attorney and substituted attorney Marvin Jacobson to continue the CIP. (Def. Ex. 17; Schinzing Depo. at 120; Memorandum Opinion and Order at 2.)

44. Jacobson never communicated with Tate nor received any information from him concerning where the subject matter for the CIP application had originated. Jacobson communicated with Schinzing, and received the CIP application from him. (Jacobson Depo. at 5-7.)

45. On June 14, 1990, Jacobson amended the CIP application, cancelling claims 1-6, and adding claims 7-11. (Def. Ex. 17.)

46. In his request for reexamination and reconsideration, Jacobson stated that the new claims were directed toward an aspect of the invention, the subject matter of which had not been dealt with in any prior art references. It specified that this novel aspect was the manner in which the wheels were rotated and cleaned. Claim 7 stated that the machine comprised means for rotating and cleaning the wheels of a stationary chair. Dependant claims 8-11 described a pair of spaced-apart rotatable rollers to rotate the wheel which rested on them, and a brush located between the rollers "in cleaning contact with the wheelchair wheel." (Def. Ex. 17.)

47. In his deposition, Schinzing stated that the idea of rotating the wheels with brushes was his idea. (Schinzing Depo. at 122.)

48. On August 1, 1990, claims 8-11 were rejected as obvious in light of prior art included in the Haverberg '650 Patent. The patent examiner, Frankie L. Stinson, noted that the '650 Patent, although not intended for wheelchair washing, nevertheless disclosed rotatable

spaced-apart rollers and a brush, adding that "to have a roller located between the spaced rollers is obvious matter of mechanical design." (Def. Ex. 17.)

49. The CIP application ultimately went abandoned for failure to respond to the August 1, 1990 Office letter. (Def. Ex. 17.)

50. In October 1990, Jacobson and a draftsperson went to Greene, Iowa and viewed a mockup and drawings of Elm Springs' wheelchair washer. (Jacobson Depo. at 16-17; Def. Ex. 20.)

51. Jacobson and the draftsperson subsequently used the drawings for another patent application. (Jacobson Depo. at 17-18.)

52. Jacobson decided to file a new application, rather than a CIP. He believed the machine was then a new entity, because it had three additional inventors who had significantly changed the manner and function in which the machine operated. (Jacobson Depo. at 19-20.)

53. Jacobson discussed inventorship with the Elm Springs people, and advised them to make certain that all the people they believed were inventors had actually contributed some part of the patentable aspect of the machine. (Jacobson Depo. at 24-25.)

54. The three additional inventors, Dallas Foster, Gale Brinkman, and Michael Meissen, along with Schinzing, mentioned something to Jacobson about working with the University of Northern Iowa. Whatever they told Jacobson did not seem exceptional to him, and he relied on their representation that they were the inventors. Consequently, he did not investigate the students' role. (Jacobson Depo. at 21-24.)

55. Jacobson never saw the students' final report, though he may have seen drawings, or copies of drawings from it. (Jacobson Depo. at 26-67.)

56. On October 23, 1990, Jacobson wrote to Schinzing, informing him that he would begin work on the patent application, naming Schinzing, Foster, Meissen, and Brinkman as inventors. (Def. Ex. 21.)

57. Schinzing recalled that Foster, Meissen, and Brinkman made contributions to the shallow drain floor, requiring more water for washing and to keep the pump from cavitating, and made contributions to the loading device. (Schinzing Depo. at 131.)

58. Schinzing stated that Jacobson made the decision to add the other three individuals as inventors. (Schinzing Depo. at 35-36 & 131-132.)

59. On November 14, 1990, Jacobson, on behalf of Schinzing, filed the third patent application for the wheelchair washer, Application Number 07/612,757. The application listed Schinzing, Foster, Brinkman, and Meissen as inventors. (Def. Ex. 22.)

60. The third application did not cite the Haverberg Patent, and Jacobson could not recall why it was not included. (Def. Ex. 22; Jacobson Depo. at 38.)

61. On July 9, 1991, the third application was rejected by examiner Philip R. Coe. (Def. Ex. 22.)

62. On October 29, 1991, amended claims were rejected and objected to by examiner Coe. (Def. Ex. 22.)

63. On February 5, 1992, further amended claims were allowed and Schinzing was granted the '375 Patent. (Def. Ex. 22.)

64. The '375 Patent claims the following:

> **1.** A washer for cleaning a conventional wheelchair said wheelchair having a large diameter support and propulsion wheel on each side of a seat and a pair of small diameter guide wheels

> forward of the seat and below the level of the seat, said washer comprising:
>
> a) and [an] enclosed washing chamber suitable for holding a conventional wheelchair, said chamber defined by end walls, side walls, a floor and a ceiling and having a doorway in on wall through which a wheelchair can be placed in and removed from the chamber;
> b) a sump in said floor, said chamber floor being slanted to drain liquid to said sump;
> c) means for supporting a conventional wheelchair elevated above said floor in said washing chamber for exposing the underside of said wheelchair and the entire area of the wheelchair wheels to cleaning and rinsing liquid;
> d) elongated tubular liquid spray arms rotatably mounted on walls and the ceiling of said chamber, said spray arms having a series of nozzles spaced apart lengthwise on said spray arms, said nozzles angled to apply liquid onto all parts of a conventional wheelchair supported by said wheelchair supporting means including the underside of the wheelchair, the entire seating surface area of the wheelchair seat and the wheelchair wheels;
> e) means for feeding cleaning and rinsing liquid to said spray arms for rotating said spray arms and for providing said liquid to said nozzles;
> f) said means for supporting a conventional wheelchair including a rack having frame means for holding the front small diameter guide wheels of a conventional wheelchair to prevent the wheelchair from moving while being washed and roller means, the large diameter support and propulsion wheels of a conventional wheelchair resting on said roller means; and
> g) means for rotating said roller means for rotating said large diameter wheelchair wheels while liquid is applied to said wheels.
>
> **2.** The wheelchair washer as described in claim **1** further including means for moving said frame meaning into and out of said washing chamber.

(Def. Ex. 22.)

65. Figures 1 and 2 of the '375 Patent show the loading mechanism to which Michael Meissen and Gale Brinkman and Dallas Foster contributed. (Schinzing Depo at.144.)

66. Figure 3 of the '375 Patent shows the rotating spray nozzles mounted on the ceiling. (Schinzing Depo. at 144.)

67. Figure 4 of the '375 Patent shows a view of the wheelchair through the sidewall where the front wheels are a bit higher than where the back wheels rest so that there is a slant to the wheelchair causing water to run off the wheelchair. (Schinzing Depo. at 144-45.)

68. Figure 7 of the '375 Patent shows the chain with the two rollers shown and the brush in between the two rollers. (Schinzing Depo. at 145.)

69. Jacobson was not aware of any disclosure, any prior sale, any statutory bar or anything that would put the invention disclosed in the CIP application in the public domain or into public knowledge, and, therefore, Jacobson did not consider the CIP application to be prior art. (Jacobson Dep. at 44, line 21 - 45, line 24.)

**License Agreement Under The '375 Patent**

70. On July 9, 1991, Elm Springs met with members of the Grantsburg, Wisconsin City Council in Greene, Iowa, to discuss finding investors for the wheelchair washing machine. (Schinzing Depo. at 36-37 & 158-59.)

71. On August 17, 1991, Schinzing and Elm Springs terminated their agreement. After the termination, Schinzing and Elm Springs were each free to market and sell the wheelchair washing device in any way they wanted. (Schinzing Depo. at 160; Def. Ex. 26.)

72. In the fall of 1991, Schinzing began working with a Grantsburg company called DR Tech. Schinzing originally brought DR Tech an old prototype with stationery jets on the side, and a videotape and drawings of the new prototype which had rotating arms and rollers to move the wheels (Tr. p. 46, line 17-p. 47, line 6; Schinzing Depo. at 37-38.)

73. In April 1993, DR Tech became Mid-State Stainless, Inc. (Mid-State). (Schinzing Depo. at 40.)

74. On April 29, 1993, Schinzing, in partnership with a woman named Sue Spalding, S/S New Products, and Mid-State entered into a license agreement under the '375 Patent (the license agreement). (Def. Ex. 40.)

75. Under the license agreement, Mid-State received the non-transferable exclusive right to develop, manufacture, use, and market any wheelchair cleaning assembly, subassembly, components, replacement parts, or other products embodying the "licensed patent and technology." Under the license agreement, Schinzing received a royalty of $400.00 per machine. (Schinzing Depo. at 40-41; Def. Ex. 40.)

76. The license agreement states, with respect to termination:

> A. Unless terminated earlier, the term of this Agreement shall be indefinite.
>
> ***
>
> D. Upon termination of this agreement for any reason, nothing herein shall be construed to release any party from its obligation which matured prior to the effective date of termination. MSI, its affiliates or its sublicensees may after the effective date of such termination sell all licensed products in stock and complete construction of all licensed products in the process of manufacture at any time of termination and sell the same, provided that MSI shall pay to S/S royalties on such licensed products as specified in this agreement.
>
> E. Upon termination for any cause, other than the expiration of the letters patent granted under the licensed patent, MSI shall no longer have any right to the use of the licensed product or technology.

77. Schinzing received royalties under the license agreement for the first 99 units

Mid-State sold. (Tr. p. 56, lines 3-5.)

78. At the time of trial, Mid-State had sold 331 units. (Tr. p. 172, lines 13-16; Pl Ex. 8.)

79. During negotiations with Mid-State, Schinzing informed Marshall Ryan, one of the Mid-State principals, that the '375 Patent was good. Ryan would not have entered the license agreement otherwise. (Tr. p. 165, lines 12-17.)

80. Schinzing never told Ryan anything about the University of Northern Iowa students. (Tr. p. 165, line 18-p. 166, line 25.)

81. Schinzing never told Ryan about the first two patent applications, which had been rejected and abandoned. (Tr. p. 167, lines 1-13.)

82. On May 5, 1993, six days after the license agreement was entered into, Schinzing had Ryan sign a document titled "Disclosure Document Between S/S New Products and Mid-States Stainless." Ryan was in Grantsburg, Wisconsin at the time he signed the document. (Tr. p. 47, line 21-p. 48, line 2, p. 60, line 24-p. 61, line 7; Schinzing Depo. at 41-42; Def. Ex. 41.)

83. In typed print, this document states:

> I WILL IN NO WAY BUILD OR HAVE BUILD OR DISCLOSE ANY INFORMATION WITH ANYONE OR ANY OTHER MANUFACTURERS COMPANY ON SAID PRODUCTS WITHOUT THE WRITTEN PERMISSION FROM WALLY SCHINZING OR SUSAN SPAULDING.
>
> (A) AUTOMATIC WHEELCHAIR WASHER AND OR ANY MODIFICATIONS THAT MAY BE APPLIED TO PRESENT WHEELCHAIR WASHER WHICH IS A PATENTED PRODUCT.
> (B) DESIGNS FOR A SMALLER WHEELCHAIR WASHER THAT MAY BE BUILT.
> (C) DESIGNS OF CART TO CARRY WHEELCHAIRS TO

AND FROM WASH AREAS.
(D) WASHER THAT CAN BE ATTACHED TO AND PUT ON THE BACK END OF A TRAILER OR TRUCK FOR THE SOLE PURPOSE OF GOING FROM PLACE TO PLACE TO CLEAN WHEELCHAIRS.

(Def. Ex. 41.)

84. Schinzing asked Ryan to sign this document because Schinzing became concerned when he went on sales trips to market his product, and he would repeatedly see a competing product called the Wheel-Ease. Schinzing believed that Ryan was connected to the Wheel-Ease because he encountered it everywhere he went to market his own machines. Further, in the fall of 1992, Ryan had asked Schinzing if Ryan could invent his own wheelchair washing machine, and Schinzing told him he could not. (Tr. p. 50, line 3-p. 51, line 8, p. 68, lines 20-22, p. 71, line 13-p. 72, line 18; Schinzing Depo. at 42.)

85. Schinzing believed that under the disclosure document, Mid-State was allowed to build the licensed machine, but could only build other machines with his written permission. (Schinzing Depo. at 179.)

86. Schinzing wanted Mid-State to build the machine he had patented, rather than any other machines. (Schinzing Depo. at 187.)

87. Mid-State did not receive any specific consideration for Ryan signing the disclosure document. (Tr. p. 67, line 12-p.69, line 19; Schinzing Depo. at 189-91.)

88. On February 3, 1998, Schinzing terminated the license agreement. (Pl. Ex. 6.)

89. As a result of the termination, Schinzing believed Mid-State no longer had any contract rights. If Mid-State continued to build wheelchair washing machines, Schinzing believed it would be possible to sue Mid-State either for breach of contract for competing with

him, or for patent infringement. (Tr. p. 78, line 18-p.79, line 17.)

**Schinzing's Claims In The Complaint**

90. Paragraphs 1 & 2 of the Complaint refer to the license agreement and disclosure document. Paragraph 3 states, "Defendant has breached and continues to breach said agreements by failing to account and pay plaintiff royalties for all of its sales of wheelchairs [sic] washing machines and by building wheelchair washing machines and having wheelchair washing machines built without plaintiffs' written permission."

**Schinzing's And Mid-State's Current Models**

91. The wheelchair washers sold by Mid-State in 1993-95, which were reported to Schinzing on Mid-State's royalty statements, had spray arms which oscillated back and forth, but did not rotate in complete circles. (Tr. p. 100, line 23-p.101, line 22.)

92. The wheelchair washers Mid-State has sold since Schinzing terminated the license agreement also have spray arms which oscillate back and forth, rather than rotating in complete circles, and are oscillated by a motor rather than water pressure. (Tr. p. 169, line 23-p. 170, line 16.)

93. Since termination, Mid-State has also sold some models without motorized rollers. These sales were also included in the 331 total sales figure. (Tr. p. 170, line 17-p. 171, line 3.)

94. In December 2000, Petry assigned any rights he had in the '375 Patent to Mid-State. Petry also granted Mid-State a non-exclusive license under the '375 Patent, retroactive to the issue date of the '375 Patent. In exchange, Petry received $1,500. (Tr. p. 198, line 13- p. 199, line 9.)

95. Schinzing's current model of the machine does not have rubber, or a motor extending out of the side. It uses knurled bars to make the wheels turn, and has the motor in a compartment in the back. (Tr. p. 37, lines 2-12.)

96. The proposed system for heating the water was ultimately abandoned, because the water available at most nursing homes is sufficiently hot by itself. (Tr. p. 36, lines 4-20.)

**Expert Testimony**

97. Richard O. Bartz, a patent attorney and Mid-State's patent expert, testified and submitted an expert report. (Tr. p. 209, line 15; Def. Ex. 60.)

98. Bartz concluded the following: (1) the '375 patent was invalid, because the students invented features claimed in claim 1 of the '375 patent, but were not named as inventors; (2) it was inequitable conduct not to disclose to the patent office the information directed to the students' inventive activity related to the wheelchair washer; (3) the students' final report was a printed publication which renders claim 1 anticipated under 35 U.S.C. §102(b), and when combined with the other prior art of record, renders the remaining claims of the '375 patent obvious under 35 U.S.C. §103; (4) it was inequitable conduct not to disclose the students' presentation to the patent office, because it was material information; (5) the students' presentation was a public showing which renders claim 1 of the '375 patent invalid under 35 U.S.C. §102(b), and, when combined with the other prior art of record, renders the remaining claims of the '375 patent obvious under 35 U.S.C. §103; (6) it was inequitable conduct not to disclose the students' presentation to the patent office, because it was material information; (7) both the students' presentation and final report were closer prior art than anything the Examiner had of record. (Tr. p. 209-232; Def. Ex. 60.)

99. There was no cross-examination of Bartz, and Schinzing did not call an expert witness on the claim of invalidity of the '375 Patent. (Tr. p. 232, lines 5-14.)

## III CONCLUSIONS OF LAW

### Patent Invalidity

#### A. Proper Inventors

Mid-State asserts that the '375 Patent is invalid because the patent application did not disclose all the inventors and by failing to disclose the proper inventors, Schinzing committed fraud on the Patent and Trademark Office. Specifically, Mid-States argues that the '375 Patent was invalid under 35 U.S.C.§102(f) because the University of Northern Iowa students were not named as joint inventors. Section 102(f) provides that "[a] person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented." Where a non-joinder of an actual inventor is proved by clear and convincing evidence, then a patent is rendered invalid. Pannu v. Iolab Corp., 155 F.3d 1344, 1349 (Fed.Cir. 1998).

Mid-State has not proved, by clear and convincing evidence, that any of the University of Northern Iowa students contributed, in a significant manner, to the conception or reduction to practice of the invention as it was finally patented. Although the evidence does demonstrate that the students made proposals to an early prototype of the wheelchair washing machine as part of a learning experience during an undergraduate course at the University of Northern Iowa, there is not clear and convincing evidence that the students' early contribution to the claimed invention is significant measured against the dimension of the full invention. Nor is there clear and

convincing evidence that the students did more than merely explain to Schinzing well-known concepts and/or the current state of the art.

**B. Public Use**

Mid-State claims that the '375 Patent is invalid pursuant to 35 U.S.C. §102(b) because the apparatus was in use more than one year before the date of the patent application. Specifically, Mid-State argues that the exhibition of the modified prototype, at the University of Northern Iowa, at the conclusion of the undergraduate course in the Spring of 1989 in the presence of fellow classmates, their professor, representatives of Elm Spring and a congressman constituted public use. The Federal Circuit has defined "public use" as "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." Lough v. Brunswick Corp., 86 F.3d 113, 1119 (Fed.Cir. 1996). Whether an invention has been in public use requires consideration of the totality of the circumstances in light of the policies underlying this doctrine. Id. The policies include:

1) Discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available;

2) Favoring the prompt and widespread disclosure of invention;

3) Allowing the inventor a reasonable amount of time following sales activities to determine the potential economic value of a patent; and

4) Prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

Id. (Citing Tone Bros. v. Sysco Corp., 28 F.3d 1192, 1198 (Fed.Cir. 1994), cert denied 514 U.S. 1015 (1995)). Factors to be included in determining whether the wheelchair washer was in public use include:

1) The number of prototypes and duration of testing;

2) Whether records or progress reports were made concerning the testing;

3) The existence of confidentiality agreements between the patentee and the party performing the testing;

4) Whether the patentee received compensation; and

5) The extent of control the inventor maintained over the testing. Id.

Although the evidence shows that in the spring of 1989, the students gave a demonstration of the wheelchair washer prototype they had endeavored to improve, which included some proposed modifications to the early prototype, Mid-State has not proved by clear and convincing evidence that the University of Northern Iowa student demonstration of the wheelchair washer constituted a public use.

### C. Printed Publication

Mid-State argues that the '375 patent is invalid because the University of Northern Iowa student report was a printed publication within the meaning of 35 U.S.C. §102(b). To determine whether a paper is a "printed publication" as contemplated within §102(b), the Court must look to the publication's dissemination and public accessibility. The Federal Circuit, in In re: Cronyn, 890 F.2d 1158 (Fed.Cir. 1989), held that a student thesis filed in the university library was not a printed publication because the thesis had not been meaningfully catalogued or indexed. As a result, the publication was not reasonably accessible to the public. Id. at 1161. Mid-State has not demonstrated, by clear and convincing evidence, that the entire content of the student proposal originated from the students nor that the publication was reasonably accessible

to the public. To the contrary, there is conflicting evidence concerning the origination of the ideas in the student proposal and the extent to which those ideas were incorporated into the invention as finally patented. The Court finds, as a matter of law, that the student proposal is not a printed publication under 35 U.S.C. §102(b).

**D. Fraud, Inequitable Conduct, Breach Of A Duty Of Candor**

Mid-State asserts that the failure of Schinzing and his counsel to disclose to the Patent and Trademark Office that the students were co-inventors and their failure to turn over the student report constituted fraud on the PTO, inequitable conduct and a breach of their duty of candor as provided in 37 C.F.R. §1.56. "Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." PerSeptive Biosystems, 225 F.3d at 318 (citing Molins PLC v. Textron Inc., 48 F.3d 1172, 1178-79 (Fed.Cir. 1995). Mid-State has not presented undisputed, clear and convincing evidence of inequitable conduct. Indeed, there was no evidence at trial that Mr. Schinzing intentionally withheld anything from the Patent and Trademark Office. Mr. Schinzing consistently testified that the student proposal was an educational opportunity provided to the students as part of their undergraduate course requirements and that the students' proposal was not a significant part of the invention as finally patented.

**E. Obviousness**

Mid-State argues that claim 1 of the '375 patent is obvious under 35 U.S.C. §103 in view of the student proposal and/or the student presentation in combination with the other art of record and the other art identified by Richard Bartz in his expert report. Judge Davis ruled, in

his Memorandum Opinion and Order dated July 16, 2002, that claim 1 of the '375 Patent was not obvious to one skilled in the art in view of the prior art identified by Mid-States' expert Richard Bartz in his expert report. Mid-State has failed to prove, by clear and convincing evidence, that the student proposal and/or student presentation in combination with the other art of record renders claim 1 of the '375 Patent obvious.

**License Agreement**

**A. <u>Terms Of The License Agreement</u>**

Pursuant to the April, 1993 License Agreement, Mid-State received the non-transferrable exclusive right to develop, manufacture, use and market any wheelchair cleaning assembly, subassembly, components, replacement parts, or other products embodying the "license to patent and technology." The License Agreement further states, with respect to termination:

> A. Unless terminated earlier, the term of this Agreement shall be indefinite.
>
> ***
>
> D. Upon termination of this agreement for any reason, nothing herein shall be construed to release any party from its obligation which matured prior to the effective date of termination. MSI, its affiliates or its sublicensees may after the effective date of such termination sell all licensed products in stock and complete construction of all licensed products in the process of manufacture at any time of termination and sell the same, provided that MSI shall pay to S/S royalties on such licensed products as specified in this agreement.
>
> E. Upon termination for any cause, other than the expiration of the letters patent granted under the licensed patent, MSI shall no longer have any right to the use of the licensed product or technology.

Schinzing received royalties under the license agreement for the first 99 units Mid-State sold at a royalty rate of $400 per machine. As of the date of trial, Mid-State had sold 331 units.

**B. Mid-State Breached The License Agreement**

Interpretation of a contract is a question of law. Edwards. v. Petrone, 160 Wis.2d 255, 258, 465 N.W.2d 847, 848 (Wis. App. 1990). The express terms of the license agreement provide for the ongoing payment of royalties on these wheelchair washing machines until the date of termination of the license agreement. Upon termination of the agreement, Mid-State was obligated to sell all licensed products in stock and complete construction of and sell all licensed products in the process of manufacture. Mid-State contemplated that the first 99 wheelchair washing machines sold, which did not include rotary spray arms, were products covered by the license agreement and paid royalties on these products. To the extent that Mid-State breached this agreement after the date of termination, the appropriate measure of damages is the calculation of a reasonable royalty on all machines sold which embodied the licensed patent and/or technology.

**C. Disclosure Agreement**

This Court need not reach the issue of the enforceability of the May 5, 1993, agreement entered into by S/S New Products and Mid-State Stainless, Inc.

**D. Damages**

Mid-State is liable to Schinzing for damages equal to reasonable royalties for the 232 wheelchair washing machines for which it has not paid any royalties. Mid-State is liable to Schinzing for damages in the amount of $92,800.

**E. Allegations Of Fraud Not Proven**

Mid-State argues that Schinzing used the presumption of validity in the associated patent monopoly for the '375 patent to compel Mid-State to enter into the April, 1993 license agreement. Mid-State argues that, had Schinzing disclosed to Mid-State his failure to provide the

PTO material information, Mid-State would have conducted an investigation into the validity of the '375 Patent prior to entering into the license agreement. Under Wisconsin law, a party alleging fraud must demonstrate, by clear and convincing evidence (1) a false representation; (2) that the false representation was made with the intent to defraud and for the purpose of inducing another to act upon it; and (3) that the party relied on the false representation. W.H. Hobbs Supply Company v. Arnst, 270 Wis. 166, 169, 70 N.W.2d 615, 617 (1955). Mid-State has failed to demonstrate, by clear and convincing evidence, that the patent was invalid and therefore, failed to demonstrate by clear and convincing evidence these necessary elements of common law fraud in the State of Wisconsin.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 3, 2003

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## District of Minnesota

700 Federal Building
316 North Robert Street
St. Paul, MN 55101

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

417 Federal Building
515 West First Street
Duluth, MN 55802

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*